MURPHY, Circuit Judge.
I. Introduction
Defendant-appellant Samir Hedi Ben Abdenbi was charged, inter alia, with one count of fraud and misuse of a government identity document, in violation of 18 U.S.C. § 1546(a). He thereafter filed a motion to suppress all evidence discovered as a result of statements he made to federal agents during a warrantless search of. his apartment. Abdenbi entered into a plea agreement wherein he agreed to plead guilty but preserved his right to appeal the district court’s ruling on his motion to suppress. The district court denied Ab-denbi’s suppression motion, concluding that the encounter between Abdenbi and three federal agents which occurred in Ab-denbi’s apartment was wholly consensual.[1] Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we affirm the denial of Abdenbi’s motion to suppress.
II. Factual Background
In February 2002, Kenneth Grubb, a special agent criminal investigator for the Social Security Administration Office of the Inspector General, received information from INS special agent Ross Godwin concerning a social security application. Agent Grubb was told that an individual named Janis Habib Jlassi had applied for a social security card using documents the INS suspected were false. Based on his review of the information provided by the INS and his subsequent investigation, Agent Grubb formed a belief that Jlassi was in the United States illegally. To confirm this belief, Grubb concluded that *1286 he needed to speak with Jlassi. Agent Godwin agreed to accompany Agent Grubb to the address Jlassi had provided on his social security application. Agent Grubb testified that his objective was to “speak to Mr. Jlassi and basically conduct an interview with him and see if ... he had submitted that application to Social Security.”
On the morning of April 10, 2002, at approximately 6:15 a.m., Agents Grubb and Godwin arrived at Jlassi’s apartment. They were accompanied by INS special agent Jayson Mallard. The agents did not have either an arrest warrant for Jlassi or a search warrant for the apartment. All three were dressed in street clothes and each carried a gun concealed by his clothing. Agent Godwin knocked on the apartment door and it was opened by Jlassi’s roommate, Amour Bejaoui. The agents displayed their badges and asked Bejaoui if Jlassi was in the apartment. Bejaoui confirmed that Jlassi was asleep in the apartment. Grubb testified that the agents then “requested entry to the apartment so we could speak with Mr. Jlassi.” Agent Mallard testified that Bejaoui opened the door, stepped aside, and said, “Yes, come on in.”
The agents entered the apartment and moved down a hallway. Agent Godwin entered Jlassi’s bedroom and Agent Grubb stopped at a second bedroom occupied by defendant Abdenbi. Agent Mallard testified that he remained in the hallway so he “could see inside both bedrooms and into the living room.”
At the suppression hearing, Agent Grubb testified that Abdenbi was in bed, although it was unclear if he was asleep. He further testified that the bedroom door was open; the lights in the bedroom were off and it was “mostly dark”; that he stood in the doorway, not in the bedroom; and the only exit from the bedroom was the door leading to the hallway. During his direct examination, Agent Grubb testified that he identified himself as a police officer and “told [Abdenbi] that he needed to come out and requested that he step out somewhere where I could talk to him.” On cross-examination, Grubb clarified his testimony, stating that he “asked [Abden-bi] to get out of the bedroom.”[2] Grubb further testified that he did not physically touch Abdenbi, did not draw his weapon, and did not raise his voice. Abdenbi did not refuse the agent’s request, but asked if he could put on some clothes.
After Abdenbi put on a shirt and shorts, he accompanied Agent Grubb and Mr. Be-jaoui into the living room. Grubb testified that he then “waited for Agents Godwin and Mallard in the back room, and I just basically sat there with Mr. Bejaoui and Mr. Ben Abdenbi awaiting the arrival of the other two agents because at that point my case was concerning Mr. Jlassi.” Agent Godwin then entered the living room and began questioning Abdenbi. Godwin asked Abdenbi biographical questions and then questioned him regarding his right to be in the United States. Ab-denbi admitted that he was in the United States illegally. Godwin placed him under arrest.
Agent Mallard’s testimony regarding the encounter with Abdenbi in his apartment differed only slightly from Agent Grubb’s. On cross-examination, Agent Mallard first testified that he entered Abdenbi’s bed *1287 room and that Abdenbi was awake. Mallard then stated, however, that he could not remember whether his initial contact with Abdenbi occurred in the bedroom or the living room although he did remember that Agent Godwin was in the room.
Q. When you talked to [Abdenbi] about his immigration status, where was he?
A. Mr. Godwin was in the room. I believe I was in the room at that point also because we were — he told us there was a passport; I remember that.
Q. So you are not sure where you talked to him?
A. To be honest, initially the very first time I spoke to him, I don’t remember exactly which room it was.
Defense counsel asked Mallard to clarify his testimony and the following exchange took place:
Q. And that for officer safety Mr. Grubb asked Mr. Abdenbi to go to the living room. He went to the living room along with Mr. Bejaoui, and then subsequent to that Godwin and yourself came to the living room after talking to Mr. Jlassi and then talked to Mr. Abdenbi. Is that the sequence of events or not?
A. That sounds correct, yes.
At approximately 8:00 a.m., the agents left the apartment with Abdenbi and Jlassi and proceeded to the INS office. Abdenbi signed a written waiver of his Miranda rights and was questioned further. After additional investigation, Abdenbi was charged with one count of using a social security account number obtained with false information in violation of 42 U.S.C. § 408(a)(7)(A); one count of fraud and misuse of a government identity document in violation of 18 U.S.C. § 1546(a); and one count of possession of a false identification document in violation of 18 U.S.C. § 1028(a)(6).
Abdenbi filed a motion to suppress “any and all evidence seized as a result of [his] illegal seizure and interrogation.” The district court denied the motion[3] and Ab-denbi entered into a conditional plea agreement with the government, reserving the right to appeal the district court’s ruling on his motion to suppress. This appeal followed.
III. Discussion

A. Standard ofRevim

This court reviews de novo, a district court’s determination of reasonableness under the Fourth Amendment. United States v. Zabalza, 346 F.3d 1255, 1258 (10th Cir.2003). In the course of that review, we consider the evidence in the light most favorable to the government and will not overturn factual findings unless they are clearly erroneous. Id. at 1257-58. The question of whether consent to a warrantless search was given voluntarily is one of fact to be determined from all the circumstances. Schneckloth v. Bustamonte, 412 U.S. 218, 249, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). The burden of proving voluntariness is borne by the government. Id. at 248, 93 S.Ct. 2041.

B. Initial Entry into the Apartment

“The Fourth Amendment generally prohibits the warrantless entry of a *1288 person’s home, whether to make an arrest or to search for specific objects. The prohibition does not apply, however, to situations in which voluntary consent has been obtained, either from the individual whose property is searched, or from a third party who possesses common authority over the premises.” Illinois v. Rodriguez, 497 U.S. 177, 181, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990) (citations omitted). Abdenbi does not dispute that Bejaoui had authority to consent to the search of the apartment, but instead argues that Bejaoui’s consent was not given voluntarily.
After examining the evidence presented at the hearing on the motion to suppress, the district court concluded that there was “no evidence of force, threat or coercion of any kind.” On appeal, Abdenbi relies on “empirical data” set forth in several law review articles and an unpublished Ph.D. dissertation to support the broad proposition that almost all encounters, with law enforcement officers carry an “air of menace” and implicit coercion. From this he argues that Bejaoui’s consent was involuntary because no reasonable person ever feels free to decline an officer’s request for permission to enter or search.
We cannot accept Abdenbi’s broad proposition because it would have the practical effect of preventing all district courts in this circuit from ever finding that an individual’s cooperation with law enforcement officials was voluntary. The correct approach remains that articulated by the Supreme Court in Schneckloth: “[T]he question whether a consent to a search was in fact ‘voluntary’ or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances.” 412 U.S. at 227, 93 S.Ct. 2041.
Our review of the record convinces us the district court’s finding that Bejaoui voluntarily consented to the search of the apartment is not clearly erroneous. Ab-denbi lists the following factors as support for his assertion that Bejaoui’s consent was not given voluntarily: (1) the request was made by three armed officers; (2) the encounter occurred in the early morning hours in a nonpublic place; and (3) the officers used aggressive language or tone of voice. We first note that there is absolutely no record support for Abdenbi’s assertion that the agents used threatening-language or that Mr. Bejaoui knew they were armed. Further, it is axiomatic that all requests to search a home or apartment are made in nonpublic places.
The district court’s ruling was based on a consideration of the totality of the circumstances. Those circumstances indicate that Mr. Bejaoui was contacted at his home, early in the morning, by three federal agents dressed in civilian clothes. The record clearly indicates there were no threats made by any of the officers and no display of weapons or force. The agents testified that they arrived early in the morning because they hoped to speak to Jlassi before he left for work. The presence of three officers is neither inherently coercive nor dispositive to the district court’s inquiry. The record is void of any indication that Bejaoui was threatened or coerced in any way. Accordingly, we conclude that the district court did not clearly err in finding that Bejaoui voluntarily consented to the search of the apartment.
Although the dissent analyzes whether Bejaoui’s consent was broad enough to permit the agents to search the entire apartment and whether Bejaoui had authority to permit the agents to search Abdenbi’s bedroom, that analysis is misplaced because those theories have never been argued in this case. There is no *1289 indication in the record that Abdenbi raised either argument in his suppression motion. The statements of Abdenbi’s counsel cited by the dissent are insufficient to preserve the issues and are anything but a plain argument that the search exceeded the scope of Mr. Bejaoui’s consent. Dissent at 1297-98. Counsel, instead, was responding to a protective sweep argument made by the government. He then returned to his main point: that a reasonable person in Abdenbi’s position would not have felt free to terminate the encounter. Counsel’s illusory scope argument was obviously not plain to the district court either, since the court responded to counsel’s statements as follows:
Well, let me ask you this, because the ability to terminate an encounter is also integral to any of these decisions. So what does the Supreme Court ruling mean here?
The dissent does not indicate where in the record the authority issue was raised. The district court’s order, therefore, predictably contains no discussion of either the scope or the authority issue. The dissent concedes as much when it acknowledges that, “[t]he district court, however, expressly concluded only that Mr. Bejaoui consented ‘to the agents’ entrance.’ ” Dissent at 1296. The well-settled law of this circuit is that issues not raised in district court may not be raised for the first time on appeal. O’Connor v. City & County of Denver, 894 F.2d 1210, 1214 (10th Cir.1990).
Further, the issues were not raised in Abdenbi’s opening brief. Instead, his argument focused solely on whether Be-jaoui’s consent was given freely and voluntarily. The failure to raise an issue in an opening brief waives that issue. State Farm Fire & Cas. Co. v. Mhoon, 31 F.3d 979, 984 n. 7 (10th Cir.1994). Abdenbi does allude to the scope issue in his reply brief when he responds to an issue raised by the government in its brief. Abdenbi’s argument is cursory, as evidenced by his citation to a single, marginally relevant case. Dubbs v. Head Start, Inc., 336 F.3d 1194, 1202 n. 4 (10th Cir.2003) (concluding that even an issue raised before the district court is waived if it is not adequately developed on appeal). His reply brief contains absolutely no discussion of the dissent’s main point: that Bejaoui lacked authority to consent to a search of the entire apartment. Even assuming, as the dissent believes, that the scope issue “was given significant attention at oral argument,” our precedent holds that issues may not be raised for the first time at oral argument. Durham v. Xerox Corp., 18 F.3d 836, 841 n. 4 (10th Cir.1994).
The dissent thus advocates reversal in this case based on two theories not properly raised or briefed by Abdenbi and relies on Singleton v. Wulff, 428 U.S. 106, 121, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976) and Sussman v. Patterson, 108 F.3d 1206, 1210 (10th Cir.1997) for the sweeping proposition that this court should exercise its discretion to reverse on the basis of issues not raised below when a case presents important constitutional issues. Dissent at 1298. Neither Singleton nor Suss-man, however, provides any support for the dissent’s approach. In Singleton, the Court reversed the judgment of the Court of Appeals, concluding that the appellate court’s resolution of an issue not addressed by one of the parties because it had no opportunity to do so, was “an unacceptable exercise of its appellate jurisdiction.” 428 U.S. at 119-21, 96 S.Ct. 2868 (“[IJnjustice was more likely to be caused than avoided by deciding the issue without petitioner’s *1290 having had an opportunity to be heard.”). In Sussman, the issue addressed'by this court had “been briefed fully by the parties and involve[d] a pure legal issue.” 108 F.3d at 1210. In the case at bar, the issue has not been fully briefed by the parties and its resolution involves questions of fact, not purely legal questions. United States v. Pena, 920 F.2d 1509, 1514 (10th Cir.1990) (“Whether a search remains within the boundaries of the consent is a question of fact to be determined from the totality of the circumstances, and a trial court’s findings will be upheld unless they are clearly erroneous”). This court should neither raise sua sponte an argument not advanced by a party either before the district court or on appeal, nor then advocate a particular position and resolve the appeal based on that advocacy. Given Abdenbi’s failure to properly raise, brief, and argue the scope and authority issues, the dissent’s discussion and resolution of those issues is contrary to established precedent. Walker v. Mather (In re Walker), 959 F.2d 894, 896 (10th Cir.1992) (“[A] federal appellate court does not consider an issue not passed upon below.” (quotation omitted)); Perry v. Woodward, 199 F.3d 1126, 1141 n. 13 (10th Cir.1999) (“This court ... will not craft a party’s arguments for him.”).
This case illustrates perfectly the soundness of that precedent. Because the scope and authority issues were not presented to the district court, that court made no factual findings necessary to resolve the issues raised sua sponte in the dissent. Notwithstanding the dissent’s recognition that the scope of consent is a question of fact, it nevertheless reaches its conclusion by substituting for the trial court as a factfinder and assuming the facts in Ab-denbi’s favor. Dissent at 1296 (citing Pena, 920 F.2d at 1514, for the proposition that the scope of consent involves questions of fact). Thereafter, the dissent consistently treats Abdenbi as a co-tenant and relies on cases dependant on co-tenancy status to resolve the authority issue. The record, however, never establishes Abden-bi’s status in the apartment or addresses whether Bejaoui and Abdenbi had mutual use of the entire apartment. United States v. Rith, 164 F.3d 1323, 1329-30 (10th Cir.1999) (“Mutual use of property by virtue of joint access is a fact-intensive inquiry which requires findings by a couri that the third party entered the premises or room at will, without the consent of the subject of the search.” (emphasis added)). Contrary to the dissent’s interpretation of Rith, the case does not stand for the proposition that a co-tenant relationship creates a rebuttable presumption that neither co-tenant has control over the property of the other. Dissent at 1297 n.2. Rith held only that a co-tenant relationship does not create a presumption of control. Abden-bi’s failure to raise the authority issue in the district court undercuts any criticism of the government’s failure to introduce evidence of mutual use.
The record does suggest that Abdenbi was not a permanent co-tenant. Agent Grubb testified that Abdenbi “indicated he was staying there for a short period with Mr. Jlassi.” Thus, a factual assumption that Abdenbi was a mere short-term guest is far more justified than the factual assumption made by the dissent. Any assumption, however, is inappropriate in a case like this where the parties developed the record only on the issues they raised. As a consequence, we do not make any such factual assumptions on the issues raised only by the dissent or speculate on whether the agents’ actions exceeded the scope or authority of Bejaoui’s consent. Instead, we adhere to our precedent and do not further address the sua sponte issues in the dissent.

*1291
C. Encounter in Abdenbi’s Bedroom

Abdenbi next argues that he was seized, in violation of the Fourth Amendment, when he was asked to move from his bedroom to the living room. The government asserts that the encounter was not an unconstitutional seizure because Abdenbi gave consent. Florida v. Bostick, 501 U.S. 429, 434, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991) (“[A] seizure does not occur simply because a police officer approaches an individual and asks a few questions. So long as a reasonable person would feel free to disregard the police and go about his business, the encounter is consensual and no reasonable suspicion is required.” (citation and quotation omitted)). We conduct a de novo review of all the relevant circumstances to determine whether an interaction between an individual and a law enforcement officer is a consensual encounter that does not implicate the Fourth Amendment. United States v. Little, 18 F.3d 1499, 1503 (10th Cir.1994) (en banc). Relevant circumstances include, United States v. Sanchez, 89 F.3d 715, 718 (10th Cir.1996). Another relevant circumstance is whether the officers advised the individual that he was not required to cooperate. Little, 18 F.3d at 1505. Because the inquiry involves an analysis of all the circumstances, no one factor is dispositive. Id. at 1503-04.
the threatening presence of several officers; the brandishing of a weapon by an officer; some physical touching by an officer; use of aggressive language or tone of voice indicating that compliance with an officer’s request is compulsory; prolonged retention of a person’s personal effects ...; a request to accompany the officer to the station; interaction in a nonpublic place or a small, enclosed space; and absence of other members of the public.
Our review of the record has uncovered no support for Abdenbi’s assertion that there was an “impressive display of police power taking place” in his bedroom when he was asked to move to the living room. The district court found that only Agent Grubb entered Abdenbi’s bedroom, and that Agent Mallard and Agent Godwin were both in Jlassi’s bedroom when Agent Grubb asked Abdenbi to move to the living room.[4] The court further found that Ab-denbi then left his bedroom, accompanied by Grubb and Bejaoui, and sat in the living room. The record demonstrates that these findings are amply supported by the testimony of both Grubb and Mallard and are not clearly erroneous.
On direct examination, Grubb testified that he wanted Abdenbi to 'go to the living room so hé could speak to him “while Agents Mallard and Godwin were speaking with Jlassi.” On cross-examination, Grubb further testified that he did not enter Ab-denbi’s bedroom, but stood in the doorway. Agent Mallard stated on cross-examination that he stood in the hallway while Agent Godwin entered Jlassi’s bedroom and Agent Grubb entered Abdenbi’s bedroom. Mallard then testified about his questioning of Abdenbi. He stated that Agent *1292 Godwin was in “the room” when he began the questioning but he did not specifically identify “the room” as either the living room or the bedroom. When pressed by defense counsel, Mallard admitted that he could not remember whether he first spoke to Abdenbi in the bedroom or the living room. However, Mallard then agreed that defense counsel correctly summarized the sequence of events when he stated, “[Abdenbi] went to the living room along with Mr. Bejaoui, and then subsequent to that Godwin and yourself came to the living room after talking to Mr. Jlassi and then talked to Mr. Abdenbi.”
The agents’ testimony undermines Ab-denbi’s sensationalized description of his bedroom as a scene of uncontrolled chaos. There is simply no record support for Ab-denbi’s assertion that shortly after Grubb entered his bedroom, Agents Mallard and Godwin “barge[d] into the room,” blocking the only exit and demanding to see his passport. Instead, the record supports the district court’s conclusion that Agent Grubb was the only law enforcement officer who contacted Abdenbi in his bedroom. Further uncontroverted evidence indicates that Agent Grubb identified himself as a police officer, did not display his weapon, did not raise his voice, did not physically touch Abdenbi, and was not retaining any of Abdenbi’s possessions or documents. Abdenbi calmly got out of bed, put on some clothing, and accompanied Grubb to the living room.
It cannot be contested that the encounter between Agent Grubb and Abdenbi occurred very early in the morning, in a nonpublic place with no other individuals present. The record further indicates that Agent Grubb did not advise Abdenbi that he was free to disregard the agent’s request. Although Grubb appeared in the doorway of Abdenbi’s room in the early morning hours while Abdenbi was still in bed, the encounter was calm and orderly with no show of force or physical touching. Having reviewed all the circumstances surrounding the encounter between Agent Grubb and Abdenbi, including the district court’s specific factual findings combined with other uncontroverted evidence in the record, we conclude that a reasonable person in Abdenbi’s position would have felt free to terminate the encounter with Agent Grubb. Thus, the encounter was consensual and it does not implicate the Fourth Amendment.
The dissent relies, in part, on its own findings of fact to reach the opposite conclusion. For example, there is simply no record support for the dissent’s finding that Abdenbi was “accosted” by the agents. Dissent at 1300. Abdenbi did not even testify at the suppression hearing; the only witnesses were Agents Grubb and Mallard. Hence, the agents’ descriptions of the encounter are uncontroverted and the dissent improperly embellishes those descriptions without even the benefit of Abdenbi’s testimony.
The dissent’s conclusion is also driven by its troubling determination that an individual’s subjective state of mind informs the question of whether a reasonable person would feel free to terminate an encounter with the police. Dissent at 1304. The subjective state of mind of either Grubb or Abdenbi is wholly irrelevant and plays no role in our evaluation of the circumstances surrounding the encounter. Little, 18 F.3d at 1505 (“[T]he particular personal traits or subjective state of mind of the defendant are irrelevant to the objective ‘reasonable person’ test.”); United States v. Zapata, 997 F.2d 751, 757 (10th Cir.1993) (“[The defendant’s] own *1293 subjective attitudes toward the police encounter, or any other of his particular personal attitudes, are irrelevant-”). The dissent’s approach seeks to transform the objective standard into a subjective standard and must be firmly rejected. Further, in this case there is absolutely no basis for the dissent to assume that Ab-denbi, who did not testify, is an objectively reasonable person such that his subjective state of mind is relevant to the objective analysis.

D. Encounter in the Living Room

Finally, Abdenbi argues that he was seized after he moved from his bedroom to the living room. Abdenbi, however, does not explain how the circumstances surrounding the encounter in the living room differ in any relevant way from the circumstances in his bedroom. Instead, his argument is based solely on Agent Grubb’s subjective state of mind. Grubb testified that he, Bejaoui, and Ab-denbi waited in the living room while Agent Mallard and Agent Godwin questioned Jlassi in Jlassi’s bedroom. Grubb stood just to the right of the doorway to the living room; Abdenbi was seated in a chair and Bejaoui on a sofa. Grubb further testified that while the three waited, he made small talk to keep the situation calm. Defense counsel then engaged Grubb in the following line of questioning:
Q: [ ] You said that — the impression I get from your testimony is they were free to go about their business. Go about their business doing what?
A: Well, at that point we had two agents in the residence back in that hallway, so I would not have let them mill around or approach that area again.
Q: So they weren’t free to go anywhere but sit on that couch?
A: Well, it never came to that, sir, because they consensually sat there and they never indicated they wanted to go anywhere.
Abdenbi argues that Grubb’s testimony constitutes a “candid admission” that the encounter in the living room constituted a seizure. Abdenbi’s argument, however, is foreclosed by binding circuit precedent. The correct framework within which this court must view the encounter has been clearly set forth in our prior cases. “A person is seized only when that person has an objective reason to believe he or she is not free to end the conversation with the officer.... ” United States v. Hernandez, 93 F.3d 1493, 1498 (10th Cir.1996) (emphasis added). Neither the personal traits of the individual nor the subjective intentions of the individual or the officer are relevant. Sanchez, 89 F.3d at 718; Little, 18 F.3d at 1505. Because Abdenbi’s argument is based on the subjective intentions of Agent Grubb, we must reject it.
The record demonstrates that Abdenbi was not advised that he could leave the living room and the encounter took place in a nonpublic place. There were, however, other individuals present. The encounter was calm; the agents did not display their weapons, raise their voices, or speak in a commanding tone; and there was no physical contact between Abdenbi and any of the agents. Based on a consideration of all the relevant circumstances, we conclude that a reasonable person in Abdenbi’s position would have felt free to terminate the encounter in the living room. Consequently, the encounter in the living room was consensual and not in violation of the Fourth Amendment.
The dissent repeats its theory that an individual’s subjective state of mind in *1294 forms the objective analysis of whether a reasonable person would feel free to end a police encounter. Dissent at 1304-05. Again, we must firmly reject this attempt to allow subjective state of mind to drive the objective standard.
IV. Conclusion
The judgment of the United States District Court for the District of Colorado denying Abdenbi’s suppression motion is affirmed.

. The district court also ruled, in the alternative, that the agents’ questioning was proper because they had a reasonable articulable suspicion that Abdenbi was engaged in criminal activity. Because we hold, infra, that the encounter between Abdenbi and the agents was consensual, a discussion of the district court's alternative ruling is unnecessary.

. Consistent with Grubb’s testimony on cross-examination, the district court found that Grubb "asked Mr. Abdenbi ... to come from his bedroom out into the living room.” Dist. Ct. Order (July 9, 2002) at 2 (emphasis added).

. We admonish appellant’s counsel for failure to adhere to 10th Cir. R. 28.2(A)(1) which requires that he attach to appellant's brief a copy of the district court’s written order denying appellant's suppression motion.

. Although the dissent asserts that it could not locate this finding in the record, the district court’s order states as follows:
Once inside, Agents Mallard and Godwin went to Mr. Jlassi's bedroom, where they determined his illegal status. Special Agent Grubb went with Mr. Bejaoui to a second bedroom and asked Mr. Abdenbi, the third roommate and defendant in this case, to come from his bedroom out into the living room. Mr. Abdenbi dressed and went to the living room with' Special Agent Grubb and Mr. Bejaoui.
Dist. Ct. Order .(July 9, 2002) at 2.